Filed 11/29/23  P. v. Rivera CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E080413 |
| v. | (Super.Ct.No. FWV21004088) |
| MIGUEL ANGEL RIVERA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Daniel W. Detienne, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Seth M. Friedman, Deputy Attorney Generals, for Plaintiff and Respondent.

1

Defendant and appellant Miguel Angel Rivera, who had suffered a prior felony conviction, was found in possession of parts belonging to an AR-15 rifle, including upper and lower receivers. A firearms expert testified as to the parts and that defendant possessed a lower receiver, which met the requirements of a firearm under Penal Code section 29800, subdivision (a)(1).[1] Defendant was convicted of possession of a firearm by a convicted felon.

Defendant claims on appeal that (1) an expert testified as to the ultimate issue in this case—whether the parts possessed by him qualified as a firearm—requiring reversal of his conviction; and (2) section 29800, subdivision (a)(1), is facially unconstitutional after the United States Supreme Court case of *New York State Rifle & Pistol Assn. v. Bruen* (2022) 597 U.S. ___ [142 S.Ct. 2111] (*Bruen*).

## PROCEDURAL HISTORY

Defendant was convicted after a jury trial of possession of a firearm by a convicted felon (§ 29800, subd. (a)(1)). In a bifurcated court trial proceeding after waiving his right to a jury trial, the trial court found that defendant had suffered one prior serious or violent felony conviction (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). Defendant was sentenced to four years, to be served in state prison.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

# FACTUAL HISTORY

## A. SEARCH OF DEFENDANT'S ROOM

Erika Rivera owned a home located on North Spruce Avenue in Rialto. Defendant, who was her brother, lived in the home with her. Defendant had his own bedroom, which was located in the garage area of the home. He was the only person who occupied the bedroom. The bedroom could be accessed either through the home or the garage.

In the summer of 2021, Erika[2] went into defendant's bedroom to clean. While cleaning, she found a piece of metal under his bed that looked like it was part of a firearm. She told defendant to get rid of it. Defendant told her he would throw it away. Defendant was the only person in Erika's home who had access to the safe in defendant's room.

Rialto Police Corporal Quinonez was called to Erika's home at approximately 1:30 p.m. on October 31, 2021. Quinonez entered the home and tried to make contact with defendant, who was in his room. Quinonez identified himself as a Rialto police officer and tried to get defendant to come out of his room for 10 to 15 minutes, but defendant did not respond. Quinonez could hear movement in the bedroom.

When Quinonez could not get into defendant's bedroom from inside the house, Erika gave him access to the garage. Quinonez entered the bedroom through the garage. Defendant was alone in the room and was on the bed. Defendant was handcuffed and

---

[2] We refer to this witness by her first name for clarity as she shares a last name with defendant. No disrespect is intended.

3

removed from the room. A search of the room was conducted by Rialto Police Officer Waidley.

Inside the room, an empty gun box was found on the floor next to a small safe. Also in the room was a larger, wall-mounted safe. Defendant did not provide keys to the wall safe but it was pried open by Waidley. Inside the wall safe, Waidley found a lower receiver for an AR-15 rifle. He found a rifle scope and muzzle compensator, which could be screwed into the barrel of a rifle.[3] Waidley also found a charging handle, which he described as a device that sat on the upper receiver of a rifle and could manually be pulled back in order to chamber a round in the rifle. He also found a bolt, which contained the firing pin. He explained that the firing pin hits the primer of a round of ammunition and sends it through the barrel of a firearm. An upper receiver and buttstock for a rifle were also found. None of the parts were assembled and no ammunition was found.

A receipt was found in the room bearing defendant's name. Waidley transported the items to the police station and assembled all the parts together. He did not attempt to fire the weapon as it would have been unsafe to fire; it might explode. The lower receiver was missing the trigger housing. The trigger housing—which contained the trigger, hammer, and sear—was needed "for the firearm to function properly." The lower receiver appeared to be in the process of being drilled out to accommodate the trigger housing. The hole was not yet big enough to hold the trigger housing.

---

[3] Officer Waidley had used an AR-15 rifle for his entire law enforcement career.

Waidley stated that in order to fire a bullet from the assembled parts found in defendant's room, it would require pulling the bolt back manually and then slamming the bolt forward with the hand to get it to fire. It would fire from the upper receiver. It could not fire as a semiautomatic weapon.

B.      EXPERT TESTIMONY

Eric Bremner was a commander with the Bureau of Investigation at the San Bernardino County District Attorney's office. Prior to this employment, he spent 15 years as a police officer. He had used firearms during his employment and trained others on the use of firearms.

Bremner explained that an AR-15 weapon had a lower receiver. It was possible to purchase what was called an "80 percent lower" receiver, which had some holes drilled in the rear but was missing the center hole for the trigger. The buyer of the 80 percent lower receiver would complete the drilling of the trigger hole. Bremner personally observed and photographed the AR-15 parts found in defendant's room. A lower receiver was found in defendant's room. It had been an 80 percent lower receiver but there had been some post-manufacturing milling and drilling done to the part where the trigger would be placed. Bremner did not think it was essential that the trigger was not found in defendant's room; the lower receiver had been drilled to contain a trigger. The part found in defendant's bedroom was a lower receiver and was "an AR-15 lower

5

receiver as defined by the ATF and DOJ." In order to be a receiver, it did not need to fire a round or be in working order. No serial numbers were found on the parts.[4]

Defendant presented no evidence on his behalf.

**DISCUSSION**

A.    ADMISSION OF EXPERT TESTIMONY

Defendant contends that Bremner, the firearm's expert, testified that the modifications to the lower receiver found in defendant's room made this a firearm under the law. This was a legal conclusion that was to be decided by the jury. The admission of this testimony decided the ultimate issue for the jury in this case.

1.    *ADDITIONAL FACTUAL BACKGROUND*

Prior to trial, defendant filed a motion in limine requesting the People not be allowed to reference that the firearm found was not registered to defendant, nor that it was potentially stolen or a ghost gun. During the discussion of whether the expert could refer to this information, the trial court asked how the People would need to discuss the pieces found and how they came together to be a firearm. The trial court noted that the People could present evidence of the parts, what happens when they are put together, whether or not it would shoot once all the parts were assembled and the type of gun that the assembled parts made. Testimony as to whether it was registered or a ghost gun seemed irrelevant. The trial court felt that it was important for both sides that the expert advise the jury that there were no serial numbers. Defendant did not just buy a gun and

_____

[4] We will provide further detail of Bremner's testimony, *post*.

take it apart. It was important to the defense because the issue in the case was whether these various parts were considered a firearm.

Prior to the expert's testimony, defendant's counsel objected to exhibits that the prosecutor sought to admit at trial, which contained labels to the parts found in defendant's room, which said "firearm" and "not a firearm." The prosecutor responded that the expert was allowed to testify as to his opinion of whether the lower receiver was in fact a firearm. The trial court referred to Evidence Code section 805. The trial court understood the expert could give an opinion on the ultimate issue but could not give an opinion that "embraces" the ultimate issue to be decided by the trier of fact. The trial court advised that the expert could not say, "This is a frame which makes it a firearm under Penal Code section 29800, or federal law, or whatever. That's embracing—that's the ultimate issue, that's for the trier of fact." The trial court agreed that the labels on the exhibits should be redacted.

The trial court stated the expert could testify about the parts found in defendant's room and define the parts, state if they had been manipulated, and what they do if they are all put together, but could not call it a firearm. The prosecutor was under the impression that a lower receiver that was smooth was not a firearm and was sold as an 80 percent receiver, which did not constitute a firearm. The prosecutor understood that it was only when the milling or drilling of holes for a trigger was attempted that it became a firearm. It did not matter whether the assembled parts could fire a bullet; what made it a firearm was the drilling of the lower receiver. The expert was needed in order to clarify that only a milled or drilled lower receiver was necessary. The prosecutor stated that it

7

was not enough to just possess the lower receiver under California law. The trial court disagreed and stated that CALCRIM No. 2511 provided a definition that a lower receiver was a firearm. It was not clear to the trial court that an additional element was that it was drilled or milled in order to constitute a firearm.

Defendant's counsel, after a break, advised the trial court that she was confused as to what could be asked of the expert. The trial court stated, "I can't tell you exactly what you can go into or not." However, Bremner could not testify that the receiver was illegal and that defendant was guilty of the crime. Bremner could testify that there was a lower receiver in defendant's room, which embraced the ultimate issue but could not advise the jury that it was a firearm and that it was illegal. The trial court clarified that the expert could testify to the receiver being milled and could use the term 80 percent receiver. The trial court gave no further guidelines and told defendant's counsel to object if she thought the testimony was improper.

During Bremner's direct testimony, he testified that the lower receiver found in defendant's room qualified as a receiver under the definitions set by the ATF and DOJ. The prosecutor asked Bremner if there had not been any drilling or milling, whether it would be considered a lower receiver. Bremner testified, "if there were no milling in this area here, where all that material had been removed, if there were no holes drilled for the hammer, the trigger, the safety selector and the take-down pin, this would not be considered a firearm." Defendant's counsel objected. A sidebar was held off the record. The trial court struck the question and answer.

8

On cross-examination, defendant's counsel inquired whether defendant could have legally purchased the solid lower receiver without the drilled holes, online. Bremner explained that prior to July 2021, anyone could purchase a solid lower receiver that had not been milled online or in a store. Bremner stated that a lower receiver that was in a solid state, was not a firearm. There was no objection to the answer.

Defendant's counsel inquired "You testified on direct that once the holes for the selector trigger and hammer pin, which are three holes, . . . that's when it becomes the, I guess, 80 percent AR receiver, correct?" Bremner responded, "No." He explained that if there was no milling at all, and it was a solid piece lower receiver, then it would be considered an 80 percent lower and would not be considered a firearm. There was no objection. He also testified, "If there are holes drilled, even if one hole was drilled, you have begun completing a firearm, and this is no longer. Once you drill one hole or three holes, you no longer have an 80 percent lower." There was no objection. He also testified, "As soon as one hole here, one here, one hole here, milling out here, as soon as that occurred, you no longer have an 80 percent lower, you have a firearm." There was no objection and the testimony ended for the day.

Defendant's counsel moved for a mistrial based on the statements made by Bremner on cross-examination that once a receiver had been drilled, it became a firearm. Defendant's counsel argued that the trial court had advised the prosecutor that Bremner could not testify as a legal conclusion that it was a firearm. The prosecutor argued that it was defendant's counsel who elicited the term firearm. The one question by the prosecutor that elicited the term firearm was stricken.

9

The trial court noted that the testimony by Bremner that a solid lower receiver was not a firearm but had to be milled was not helpful testimony for the prosecution. This was more than was required under the law and the language of CALCRIM No. 2511. The trial court continued, "Having said that, you objected, I sustained your objection and struck the answer. But then on cross-examination you kept going into this and asking him about it, and he was giving these opinions." Defendant's counsel inquired how she was supposed to address the issue when it was allowed on direct. The trial court disagreed it was allowed on direct as it had stricken the testimony that it was a firearm.

Defendant's counsel insisted she had to address that the lower receiver found in defendant's room had been drilled but did not expect Bremner to say firearm. The trial court opined that the expert made it more difficult for the prosecution to prove its case than required under the law. In denying the request for mistrial, the trial court stated the bottom line was whether defendant could receive a fair trial. "I think he can because his opinion is not helpful to the People's case." Further, the jury would be instructed that a frame or receiver was a firearm. The motion was denied without prejudice.[5]

On redirect, Bremner was asked to clarify the law on lower receivers. He testified that effective July 1, 2022, a person in California could not purchase an 80 percent lower receiver without going through the process of purchasing a normal firearm. The lower receivers had to be marked or serialized. Bremner was asked, "So if someone . . . that was unauthorized to purchase a firearm went ahead and purchased an 80 percent lower,

---

[5] Defendant does not contend on appeal that the trial court erred by denying his motion for mistrial.

10

AR-15 lower, online or through a third person, would that purchase of the 80 percent lower been a violation of the law?" Bremner responded, "At that time, no." However, if that person drilled holes in the 80 percent lower receiver, it would be a violation of the law. There was no objection.

Bremner later testified "When an 80 percent lower is purchased, it is an 80 percent lower until the first hole is drilled, until the first bit of material is removed. Now it's no longer 80 percent receiver. The minute that's done, the process that I described earlier to get it serialized and registered to the owner, because they are manufacturing a firearm, has to be in effect." There was no objection. He further testified, "Again, as soon as you drill one hole or remove any piece of material, you no longer have an 80 percent. And the minute you do that, you are manufacturing a firearm and you have to go through that process to make it legal." There was no objection. The prosecutor asked Bremner if all the parts appeared to be a firearm in working order. Bremner testified, "All the parts weren't there, but the receiver, as it was drilled, as it was milled, appeared to me to meet the description of a firearm pursuant to the law." Defendant's objection was sustained and the trial court struck all the testimony after "appeared."

The jury was instructed on expert testimony, in part, as follows: "A witness was allowed to testify as an expert and to give an opinion. You must consider the opinion, but you are not required to accept it as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training and education, the reasons the

11

expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

The jury was instructed on the crime of possession of a firearm, CALCRIM No. 2511. It was instructed that the People must prove that defendant possessed a firearm, the defendant knew that he possessed the firearm and that he had previously been convicted of a felony. It also was instructed, "A firearm is any device designed to be used as a weapon from which a projectile is expelled or discharged through a barrel by the force of an explosion or other form of combustion. [¶] The frame or receiver of such a firearm is also a firearm for the purpose of this instruction. [¶] A firearm does not need to be in working order if it was designed to shoot and appears capable of shooting."

### 2. *STANDARD OF REVIEW*

Section 29800, subdivision (a)(1), provides, "Any person who has been convicted of a felony under the laws of the United States, the State of California, or any other state, government, or country, . . . and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony." Section 16520 defines the term "firearm." It provides, "As used in this part, 'firearm' means a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion." (§ 16520, subd. (a).) Subdivision (b) of section 16520 provides, "As used in the following provisions, 'firearm' includes the

12

frame or receiver of the weapon, including both a completed frame or receiver, or a firearm precursor part:  [¶] . . . [¶] (19) Sections 29800 to 29905, inclusive."

Evidence Code section 801, subdivision (a), provides that expert testimony can be admitted "related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."  (See also *People v. Vang* (2011) 52 Cal.4th 1038, 1044 [expert testimony admissible if the subject matter was sufficiently beyond common experience that the opinion would assist the trier of fact].)  " 'That is not to say, however, that the jury need be wholly ignorant of the subject matter of the expert opinion in order for it to be admissible.  [Citation.] . . . Rather, expert opinion testimony " 'will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that [those with] ordinary education could reach a conclusion as intelligently as the witness." ' " ' "  (*People v. Brown* (2014) 59 Cal.4th 86, 101, italics omitted.)

"Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact."  (Evid. Code, § 805.)  "There are limits to expert testimony, not the least of which is the prohibition against admission of an expert's opinion on a question of law."  (*Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178.)

" 'As a general rule, a trial court has wide discretion to admit or exclude expert testimony.  [Citations.]  An appellate court may not interfere with the exercise of that discretion unless it is clearly abused. ' "  (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506; see also *People v. Brown*, *supra*, 59 Cal.4th at p. 101.)

Defendant does not dispute that Bremner could testify as an expert on firearms. He contends the expert stated that the lower receiver was a firearm thereby usurping the role of the jury to make such a decision. However, these statements made by Bremner were either stricken after defense counsel's objections, or defendant failed to object, waiving the issue on appeal.

### 3.     *WAIVER AND STRICKEN TESTIMONY*

Initially, there were two times in which Bremner stated that the lower receiver, as drilled, met the description of a firearm under the law. Both times, defendant objected and the trial court struck the testimony. As such, the jury was not to consider the testimony in reaching its decision on the charge. The jury was instructed, "During the trial, the attorneys may have objected to questions or moved to strike answers given by the witnesses.[6] I ruled on the objections according to the law. If I sustained an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did. If I ordered testimony stricken from the record, you must disregard it and must not consider that testimony for any purpose." We must presume the jurors followed the given instructions and did not consider the testimony. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Moreover, defendant failed to object to the other instances in which Bremner referred to the drilled and milled lower receiver as a firearm. On cross-examination, Bremner testified that a solid receiver, one which had not been drilled like the one found

---

[6] Prior to trial, the jury was similarly instructed.

14

in defendant's room, would not qualify as a firearm. There was no objection by defendant. Bremner also testified that if holes were drilled in a receiver, it was a completed firearm. There was no objection by defendant. On redirect, Bremner testified that drilling a hole in a lower receiver was manufacturing a firearm. There was no objection.

The failure of defendant to object to the testimony waives the issue on appeal. (Evid. Code, § 353, subd. (a); *People v. Ramos* (1997) 15 Cal.4th 1133, 1171 [" 'A party desiring to preserve for appeal a challenge to the admission of evidence must comply with the provisions of Evidence Code section 353, which precludes reversal for erroneous admission of evidence unless: "There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated to make clear the specific ground of the objection or motion"].) An objection in this case would not have been futile as earlier objections to Bremner's use of the term firearm had been sustained and the testimony stricken. As such, defendant waived any claim regarding Bremner expressing his opinion on the ultimate issue to be decided by the jury.

### 4. *PREJUDICE*

Although we do not find any error in this case, even if there was any conceivable error in the admission of Bremner's testimony, it was harmless. State law evidentiary errors generally do not rise to the level of federal constitutional error. (*People v. Benavides* (2005) 35 Cal.4th 69, 91.) Rather, they are reviewed under the *Watson* standard for whether it is reasonably probable the result would have been different absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

15

As noted, the jury was instructed with CALCRIM No. 2511 that a receiver qualifies as a firearm. Both Waidley and Bremner testified that defendant possessed a lower receiver. Although Bremner testified that the receiver had to be milled or drilled in order to be considered a firearm, we have found no authority which supports such further requirement. It was sufficient for the jury to be advised that a lower receiver for an AR-15 weapon was found in defendant's room and it was in his control. Thus, it is inconceivable the jury determined that the lower receiver was a firearm pursuant to section 29800 based on Bremner's testimony. It need only determine that defendant possessed a lower receiver to find him guilty. Based on the instructions given and the testimony, the jury properly determined that defendant was guilty of possession of a firearm by a felon.

B.     <u>CONSTITUTIONALITY OF SECTION 29800</u>

Defendant claims that his conviction for possession of a firearm by a felon is an unconstitutional violation of his right to bear arms under the Second Amendment to the United States Constitution and must be reversed. This court recently rejected this identical claim in *People v. Alexander* (2023) 91 Cal.App.5th 469, 479 (*Alexander*).) We see no reason to revisit the finding in *Alexander* and agree that section 29800 does not violate the Second Amendment.

The Second Amendment specifies: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." (U.S. Const., 2d Amend.) Recently, the United States Supreme Court clarified the test for assessing constitutionality under the Second Amendment and, held

16

that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' ' [Citation.] *Bruen* further explained that in assessing whether a modern firearm regulation has a 'relevantly similar' historical analogue [citation], courts should consider 'at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense.' " (*Alexander*, *supra*, 91 Cal.App.5th 469, 476.)

In *Alexander*, the defendant argued that under the framework set forth in *Bruen*, section 29800, which prohibits the possession of firearms by convicted felons, was facially unconstitutional. Specifically, he argued that section 29800, subdivision (a)(1), was "facially invalid under the Second Amendment because [it] violate[d] his 'Second Amendment right to bear arms in self-defense under the new standard of review in *Bruen*.' " (*Alexander*, *supra*, 91 Cal.App.5th at p. 474.) This court found that California's laws prohibiting felons from possessing firearms do not violate the United States Constitution. "[T]he Second Amendment protects the individual right of ' "law-abiding, responsible citizens" ' to possess firearms. [Citations.] Convicted felons, by definition, are not law-abiding. Felons thus are not among 'the people' who have an individual right to possess firearms under the Second Amendment. [Citation.] We consequently conclude that [defendant]'s challenges to the constitutionality of section

17

29800(a)(1) . . . under the Second Amendment fail under the first step of *Bruen*'s analytical framework."  (*Id*. at p. 479.)

In *People v. Odell* (2023) 92 Cal.App.5th 307, 317, the court also considered section 29800, subdivision (a)(1), and agreed with *Alexander*, finding that section 29800, subdivision (a)(1), is constitutional.  The court noted, "It was no accident the *Bruen* majority repeated the qualifier 'law-abiding' some 13 times.  [Citation.]  People who have been convicted of a felony are not 'law-abiding.' "  (*Odell*, at p. 317.)

We follow the reasoning in *Alexander* and *Odell* and reject defendant's facially unconstitutional challenge to section 29800.

## DISPOSITION

The judgment is affirmed in full.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

CODRINGTON
J.

FIELDS
J.